[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 11, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-12654

_____

D. C. Docket No. 05-00118-CV-1-MP-AK

ANNE S. BECKER, individually and
as Trustee of Anne S. Becker
Charitable Remainder Unitrust,

Defendant-Appellee,

versus

JOHN A. DAVIS,
a.k.a. Jeff Davis,
FALCON FINANCIAL MANAGEMENT, INC.,
FALCON FINANCIAL PLANNING, INC.,
MULTI-FINANCIAL SECURITIES CORPORATION,
successor by merger to IFG Network
Securities Inc.,

Plaintiffs-Appellants,

WILLIAM D. KING, et al.,

Defendants.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

**(July 11, 2007)**

Before CARNES, WILSON and HILL, Circuit Judges.

WILSON, Circuit Judge:

This appeal concerns a motion to compel a plaintiff, Anne S. Becker ("Becker"), to submit the claims in her complaint to arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1-16. Becker, on her own behalf and as trustee on behalf of her charitable remainder trust, filed a complaint against various financial advisors alleging that they provided her and the trust with unsound financial advice. We conclude that some of Becker's individual claims are subject to arbitration and others are not. We further conclude that the financial advisors who did not contract with Becker to submit their disputes to arbitration can compel arbitration only to the extent that they allegedly collaborated with those who did so contract.

Becker, individually and as the trustee for the Anne S. Becker Charitable Remainder Unitrust ("the Trust") (collectively "the plaintiffs"), filed suit in the United States District Court for the Northern District of Florida against John A. Davis, Jr.; William D. King; Falcon Financial Management, Inc.; Falcon Financial Planning, Inc.; Multi-Financial Securities Corporation, successor by merger to IFG Network Securities, Inc.; IFG Advisory Services Inc., f/k/a Associated Financial Planners, Inc.; Michael T. Hartley; Dale K. Ehrhart; Michael G. Tillman; Michael

2

Tillman, P.A.; and Tillman Hartley LLC.  Essentially, the complaint alleges that these defendants provided Becker and the Trust with unsound financial advice that lined the pockets of the the defendants at the expense of plaintiffs.

The defendants John A. Davis ("Davis"), Falcon Financial Management, Inc., ("Falcon FM"), Falcon Financial Planning, Inc. ("Falcon FP"), Multi-Financial Securities Corporation, successor to IFG Network Securities, Inc. ("IFG-SEC") and IFG Advisory Services, Inc. ("IFG-AS") (collectively "the defendants") filed a motion to compel arbitration based on three contractual agreements that the Trust entered into with Davis and IFG-SEC.  Each of the three agreements contain an arbitration clause.  The district court granted the defendants' motion in part and denied the motion in part.  The court granted the motion as it related to the claims brought by Becker as trustee on behalf of the Trust.  The court denied the motion as it related to the claims brought by Becker in her individual capacity, because she was not a signatory to the agreements.  The district court also denied the motion as to Falcon FM and Falcon FP, because they, too, were not signatories to the agreements.  The defendants appeal the district court's order.  We affirm in part, reverse in part, and remand for the reasons set forth in this opinion.

## I. BACKGROUND

In 1994 Becker inherited approximately $9 million and moved to Florida a

3

year later. Shortly after her arrival in Florida, Becker met Defendant William D. King ("King"), who introduced her to Davis and defendant Michael G. Tillman ("Tillman").[1] During all relevant times, Davis was president and principal owner of Falcon FM and Falcon FP. Davis was also a registered representative and registered principal of IFG-SEC and a registered investment advisor of IFG-AS. In late 1996, on the advice of Davis, Becker created the Trust and named herself and Davis as trustees.[2] Becker claims that she ultimately placed approximately $3 million, one third of her assets, in the Trust.

A. The Complaint

On July 15, 2005, Becker and the Trust filed suit against the defendants. The complaint alleges a wide variety of allegations. In general, the complaint alleges that all the defendants were working together to induce Becker and the Trust to adopt a financial strategy that was unsuitable for her personal investment objectives. The complaint also generally alleges that the "Conspiring Defendants"[3] failed to disclose that they were engaged in a scheme to defraud Becker and the

---

[1] The defendants King and Tillman are not part of this appeal.

[2] The documents that created the Trust are not part of the record. The complaint alleges that the Trust was created on December 2, 1996, and one of the agreements that the Trust entered into with IFG-SEC also indicates that the Trust was created on December 2, 1996. However, the Trust opened an account with IFG-SEC on November 11, 1996.

[3] In the complaint, the "Conspiring Defendants" are the defendants Davis, King, Hartley, and Tillman.

4

Trust:

> (a) by wrongfully creating an inappropriate investment environment and structure to control the use and investment of Plaintiff's assets for an inordinately long period of time; (b) by wrongfully creating an investment vehicle or structure for Plaintiff that would make it very difficult, if not impossible, for her to extricate herself or her assets from the Conspiring Defendants' control; (c) by wrongfully charging Plaintiff and sharing among themselves excessive, illegal, and undisclosed fees and commissions; (d) by wrongfully creating for themselves opportunities to provide and charge Plaintiff for extensive, unnecessary, and improper fee generating "professional" services; and (e) by preparing or causing to be prepared complex documents lacking provisions customarily found in, or containing provisions not usually found in, similar types of documents properly prepared by others, and by inducing Plaintiff to execute them in order to extend improperly their own control over Plaintiff's assets, and to facilitate their continuing Scheme to Defraud; all without regard for Plaintiff's interests, and for the fundamental purpose of maximizing their own profits and wealth at the expense of their client.

The complaint more specifically alleges actions by the defendants as to Becker and actions by the defendants as to the Trust. As to Becker as an individual, the complaint alleges, among other things, that Davis, Tillman, and King gave her improper financial advice concerning a real estate transaction where Becker had purchased, along with a partner, Susan Berger, approximately 175 acres of land in Micanopy, Florida to start a business to train and board horses. Becker also alleges that Davis opened a money market account without her consent in the name of "ANNE S. BECKER & JOHN A. DAVIS JR JTWROS (joint tenants with right of survivorship)." Further, based on Davis's advice, Becker also

5

created the Anne S. Becker Irrevocable Trusts. These two trusts were created to provide life insurance benefits to certain beneficiaries. Becker alleges that Davis received, without her knowledge, an insurance agent commission in connection with the insurance policy issued to her and that the trusts themselves were unsuitable for Becker's needs.

The complaint alleges, among other things, that pursuant to the advice of Davis and King, the Trust invested in the CNL Income Fund XVIII, Ltd. ("CNL") and the investment in this security was unsuitable for the Trust. Also pursuant to Davis and King's advice, the Trust opened investment accounts with DKE and SEI Investments. The complaint alleges that Davis and his companies received improper fees based on these investments.

Based on these and other factual allegations, Becker and the Trust filed a twenty-count complaint. Becker, in her individual capacity, brought fifteen counts. The Trust brought four counts, and Becker and the Trust collectively brought one count.[4]

B. The Arbitration Agreements

During the course of Becker and the Trust's relationship with the defendants, the Trust executed three agreements with IFG-SEC. On November 11,

---

[4] Counts Thirteen and Eighteen do not seek relief against moving the defendants.

1996, the Trust executed the Goals Direct Client Services Agreement ("agreement one"). Agreement one, which was signed by Becker, as trustee, and lists Davis as the registered representative of IFG-SEC, opened an investment account with IFG-SEC, which would provide the Trust with broker and portfolio advisor services for the purchase and sale of securities. Agreement one contains an arbitration clause, which states that "[a]ny controversy between us arising out of our business or this agreement shall be submitted to arbitration conducted before the National Association of Securities Dealers Inc., in accordance with their rules."

On December 7, 1996, the Trust executed a document that opened another account with IFG-SEC ("agreement two"). Agreement two also contains an arbitration clause, which provides that "[i]t is agreed that any controversy between myself and IFGNS[5] arising out of the business of IFGNS or this Agreement . . . shall be submitted to arbitration conducted under the Code of Arbitration Procedure, then applying, of the National Association of Securities Dealers, Inc." The record copy of agreement two is practically illegible, and the line containing the parties signatures is cut off. However, it is clear that the account was opened on behalf of the Trust.

On October 18, 1998, the Trust executed a document opening another

---

[5] IFGNS refers to IFG Network Securities, Inc., which is referred to as IFG-SEC in this opinion.

account with IFG-SEC ("agreement three"). Agreement three is the same

document as agreement two and contains the same arbitration clause. Agreement

three was signed by Becker as trustee and Davis as a representative of IFG-SEC.

However, agreement three contains an additional page that limits the type of

services provided by IFG-SEC to the Trust.[6] Paragraph twelve on the second page

of agreement three states that the representative, "might offer non-securities

products and services. I also understand all non-securities products and services

are outside Representative's relationship with IFGNS and as such I shall hold

IFGNS harmless for any loss I may incur associated with non-securities products

and services." Agreement three describes such non-securities products and

services as insurance, real estate, accounting, tax preparation, and financial

planning, among other things.

Relying on these three agreements, the defendants filed a motion to compel

arbitration of all the counts against them in the complaint, both the counts brought

on behalf of the Trust, as well as the counts brought on behalf of Becker. In its

order granting in part and denying in part the defendants' motion, the district court

made three separate rulings, each of which is before us on appeal. First, the district

---

[6] It is apparent that at least two of the three agreements contained in the record are incomplete. Agreement one is missing pages. Agreement two is virtually illegible and is only one page, even though the document indicates that it had a reverse side to it.

court denied the defendants' motion as it related to Becker's individual claims, because Becker, in her individual capacity, was not a signatory to the agreements. Second, the district court found that only the defendants Davis, IFG-SEC, and IFG-AS[7] could compel the Trust to arbitrate, for the other defendants, Falcon FM and Falcon FP, were not signatories to the agreements. Third, the district court held that Becker and the Trust's claim for an accounting of the Trust's assets did not arise from the "business" as referred to in the three agreements, and therefore, this claim was not subject to arbitration.

To decide this appeal, we review the scope of the three arbitration agreements between the Trust and the defendants, and engage in a painstakingly thorough review of a twenty-count, 110 page complaint.

## II. STANDARD OF REVIEW

"We review de novo a district court's denial of a motion to compel arbitration." *Jenkins v. First Am. Cash Advance of Ga., LLC*, 400 F.3d 868, 873 (11th Cir. 2005). We also review *de novo* a district court's decision to deny a motion to compel arbitration on the ground that the moving party was not a signatory. *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 946 (11th Cir. 1999).

## III. DISCUSSION

---

[7] In its order, the district court refers to the defendants IFG-SEC and IFG-AS as Multi-Financial Securities Corp., the successor corporation.

A. Scope of the Arbitration Agreements

The first step in determining the propriety of a motion to compel arbitration pursuant to Section 4 of the Federal Arbitration Act ("FAA") is "to determine whether the parties agreed to arbitrate the dispute." *Klay v. All Defendants*, 389 F.3d 1191, 1200 (11th Cir. 2004) (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth Inc.*, 473 U.S. 614, 626, 105 S. Ct. 3346, 3353, 87 L. Ed. 2d 444 (1985)).[8] While there is a liberal federal policy favoring arbitration agreements, "the FAA's strong proarbitration policy only applies to disputes that the parties have agreed to arbitrate." *Id.* A party cannot be forced to arbitrate any dispute that the party has not agreed to submit to arbitration. *See Volt Info. Scis., Inc. v. Bd. of Trs. of the Leland Stanford Junior Univ.*, 489 U.S. 468, 479, 109 S. Ct. 1248, 1256, 103 L. Ed 2d 488 (1989) ("Arbitration under the [FAA] is a matter of consent, not coercion . . .").

In agreement one, the parties agreed to arbitrate "any controversy between us arising out of our business or this agreement." The arbitration clauses in agreements two and three are substantially similar to agreement one's arbitration clause in that the parties agreed to arbitrate "any controversy between myself and

---

[8] The second step in ruling on a motion to compel arbitration is to determine "whether legal constraints external to the parties' agreement foreclosed arbitration." *Mitsubishi Motors*, 473 U.S. at 628, 105 S. Ct. at 3355. Because the parties dispute only the scope of the agreements, and not their enforcement, we need not discuss the second step of the analysis.

10

IFGNS arising out of the business of IFGNS or this agreement." All three arbitration clauses state that the arbiter of any potential dispute would be the National Association of Securities Dealers, Inc. ("NASD").

We agree with the district court's finding that the "business" referred to in the arbitration clauses was the business of providing investment services in connection with the buying and selling securities. This is evidenced by the plain language of the agreements. Agreement one outlines that the portfolio advisor will make recommendations to the Trust "with respect to investment and reinvestment of the assets in the Account in no-load investment company shares (no load mutual funds) or in load investment company shares at their net asset value." Agreement one also names a specific representative to handle all sale and purchase orders directed to it by the broker and also to handle other custodial functions performed with respect to the security brokerage account.

Agreement three specifically limits the extent of the agreement to cover only security related products and services and expressly excludes non-security services such as advice on accounting, real estate, tax preparation, and financial planning. Agreement three also specifically states that "[the client] appoints IFGNS as my agent for the purpose of carrying out my directions with respect to the purchase and sale of securities and, as such, IFGNS is authorized to open or close brokerage

11

accounts, place and withdraw orders and take such other steps as are reasonable to carry out my directions." Therefore, the parties agreed to arbitrate all disputes concerning the defendants' security related investment advice to the Trust.

### B. Becker's Individual Claims

#### 1. Becker as a Nonsignatory

Having outlined the scope of the arbitration agreements, we next consider whether Becker, as a nonsignatory to these agreements, can be bound by the agreements' arbitration clauses. The defendants argue that the district court erred in finding that Becker did not have to arbitrate her individual claims simply because she was not a signatory to the three agreements. We agree to the extent that Becker's individual claims rely upon the terms of the agreements and attempt to hold the defendants to these terms.

"Although arbitration is a contractual right that is generally predicated on an express decision to waive the right to trial in a judicial forum, this court has held that the lack of a written arbitration agreement is not an impediment to arbitration." *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 756-57 (11th Cir. 1993). Certain exceptions, such as equitable estoppel, can bind a nonsignatory to an arbitration agreement. *Id*. at 757. The defendants cite *Blinco v. Green Tree Servicing, LLC*, 400 F.3d 1308 (11th Cir. 2005); and *McBro Planning &*

12

*Development v. Triangle Electrical Construction Co.*, 741 F.2d 342 (11th Cir. 1984); in support of this argument.

In *Blinco*, Mr. and Mrs. Blinco, a husband and wife, signed and executed a mortgage. Mr. Blinco alone signed and executed the promissory note that contained an arbitration clause. Later, the Blincos brought an action against Green Tree, who owned the mortgage, for violating the Real Estate Settlement Procedures Act. We held that even though Mrs. Blinco was not a signatory on the note, she was bound by the arbitration clause because "[e]quitable estoppel precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes." *Id*. at 1312 Since Mrs. Blinco's claims against Green Tree derived from her status as a borrower under the promissory note, we held that she could not rely on the note to establish her claims and at the same time seek to avoid the obligation to arbitrate her claims. *Id*.

In *McBro*, we also held that a party may be equitably estopped from asserting that the lack of a written arbitration agreement precludes arbitration. 741 F.2d at 344. The plaintiff, a general contractor, entered into an agreement to renovate a hospital. The agreement contained an arbitration clause, as well as references to the construction manager, McBro. The agreement also detailed McBro's duties. After the project began, the general contractor alleged that McBro

13

interfered with its work, and the contractor filed an action alleging, among other things, contractual interference and negligence counts. McBro moved the district court to compel arbitration, and the court granted the motion. The contractor argued that it did not have a written agreement with McBro, and the Federal Arbitration Act requires that there be a written agreement between parties to arbitrate.

We affirmed the district court's order compelling arbitration. *Id*. at 344. We stated that although the contract between the contractor and the hospital actually disclaimed any contractual relationship between the contractor and McBro, "the general conditions of that contract are replete with references to McBro's duties as construction manager . . . [with] regards to the supervision of the project" and "the contractor's claims are 'intimately founded in and intertwined with the underlying contract obligations.'" *Id*. (quoting *Hughes Masonry Co. v. Greater Clark County Sch. Bldg. Corp.*, 659 F.2d 836, 841 n.9 (7th Cir. 1981)). In asserting its claims against McBro, the contractor was relying on the agreement with the hospital as it related to McBro's duties; therefore, the contractor could be equitably estopped from then repudiating the arbitration clause contained in the same agreement. *Id*.

*Blinco* and *McBro* establish that if a party relies on the terms of a written agreement in asserting the party's claims, that party is equitably estopped from

14

then seeking to avoid an arbitration clause within the agreement. Therefore, to the extent that Becker is relying upon the terms of the three agreements and attempting to hold the defendants to those terms in asserting her individual claims, she is bound by the arbitration clauses contained in those agreements. Accordingly, we must focus on the nature of Becker's individual claims against the defendants to determine whether her claims fall within the scope of the arbitration clauses contained in the agreements.

### 2. Applicability of the Arbitration Agreements to Becker's Individual Claims

Citing *McBro*, the defendants argue that since each count in the complaint incorporates allegations that the defendants failed to provide Becker and the Trust with proper investment advice, Becker's individual claims are intertwined with or connected to the agreements that contain the arbitration clauses. Therefore, the defendants argue that all of Becker's individual claims are subject to arbitration.

Our holding in *McBro* does not compel a finding that *all* the disputes in the complaint are subject to arbitration. In *McBro*, we adopted the Seventh Circuit's reasoning in *Hughes* that a plaintiff's claims were subject to arbitration if in the complaint the plaintiff was attempting to hold the defendant to the terms of the agreement that contained an arbitration clause. 741 F.2d at 344. Only then would the plaintiff's claims be "'intimately founded in and intertwined with the

15

underlying contract obligations.'" *Id*.; *see Sunkist*, 10 F.3d at 757 (stating that the decision in *McBro* "rest[ed] on the foundation that ultimately, [the] party must rely upon the terms of the written agreement in asserting [the party's] claims").

In this case, not all aspects of Becker's claims rely upon or attempt to hold the defendants to the terms of the three agreements. For example, in Count Seven, Becker alleges that the defendants breached a fiduciary duty owed to her as an individual.[9] Not all aspects of this count concern investment advice to the Trust. Paragraphs 54–64 allege that in early 1996, prior to the creation of the Trust, Becker and her friend Susan Berger purchased approximately 175 acres of land to train and board horses. Becker and Berger owned the farm as joint tenants with right of survivorship, and Becker incorporated the business, naming it Broken Fiddle. Becker borrowed a large sum of money in order to operate the business and secured the note with the farm's mortgage. Becker alleges that the defendants Davis, Tillman, and King gave her poor financial advice as to the structure of the note and mortgage, and they failed to secure Berger's financial obligations to the business. In paragraphs 66–68, Becker alleges that she provided approximately $2 million of financial assistance to Broken Fiddle, and Davis permitted Becker to file a report with the Internal Revenue Service that the financial assistance to the

---

[9] In Count Seven, Becker realleges paragraphs 1–113.

16

business was a gift and not a loan or an investment. Therefore, Davis allowed Becker to forfeit substantial income tax benefits.

In these allegations, Becker is not relying on or attempting to hold the defendants to the terms and duties contained in the three agreements. To find otherwise would lead to an illogical result. The terms and duties contained in the three agreements refer to the defendants' obligations to the Trust concerning security investments. If we were to find that in the above allegations, some of which occurred prior to the creation of the Trust, that Becker is attempting to hold the defendants to the terms and duties in the agreements and therefore send these disputes to arbitration, the NASD would be required to arbitrate a dispute concerning Davis's advice to Becker about the structure of the farm's mortgage and the filing of her personal income tax return. These are not the type of disputes that the parties agreed to arbitrate in the three agreements. Moreover, agreement three specifically excludes real estate and tax preparation disputes from the agreement. Our case law forecloses us from forcing parties to arbitrate disputes that they did not agree to arbitrate. *Klay*, 389 F.3d at 1200.

We acknowledge that many disputes contained within Count Seven are covered by the agreements and are thus subject to arbitration. Paragraph 176 specifically alleges that Davis's decision to invest in CNL was unsuitable for the

17

Trust. This dispute clearly falls within the scope of the arbitration agreements, and Becker, as a nonsignatory, is bound to arbitrate this dispute, because in this instance, she is attempting to hold the defendants to the terms of the agreements.

We further acknowledge that the manner in which the complaint is pled is problematic because many, if not all, of Becker's individual claims against the defendants contain both arbitrable and non-arbitrable disputes. For example, in Count Nine, Becker alleges that the defendants engaged in fraud and deceit.[10] She generally alleges that "Defendant Davis falsely represented to Plaintiff that everything he did was intended to protect and enhance her financial interests," and that his representations and promises to her were false. Paragraphs 74–88 specifically refer to investments concerning the Trust. These disputes are within the scope of the arbitration agreements and are thus arbitrable. However, paragraphs 90–92 allege that Davis opened a money market account with Scudder Investments in the name of "ANNE S. BECKER & JOHN A. DAVIS JR JTWROS (as joint tenants with right of survivorship)." Becker alleges that she never gave Davis "any right, title, or interest" to her money that was deposited in the account. This aspect of Count Nine is not within the scope of the arbitration agreements, for this allegation does not implicate a dispute concerning the accounts that the Trust

---

[10] In Count Nine, Becker realleges the factual allegations set forth in paragraphs 1–53 and 69–113.

18

opened with IFG-SEC for the purpose of buying and selling securities. It is therefore not subject to arbitration. While it would be much easier to do so, we will not send clearly non-arbitrable disputes to arbitration merely because a count, as pled, contains both arbitrable and non-arbitrable disputes.

The complaint's inclusion of both arbitrable and non-arbitrable disputes within a single count is also evident in Count One. In Count One, Becker alleges that the defendants[11] violated the Florida Securities and Investor Protection Act.[12] Paragraphs 49–53 allege that in February 1996, before the creation of the Trust, Becker entered into an Investment Management Agreement with Defendant DKE on the advice of Davis, and Davis secured an improper "kick back" fee arrangement for the benefit of the defendants. Paragraphs 74–78 allege that pursuant to Davis's advice, the Trust invested in the CNL and this investment was not suitable for the Trust. Count One alleges that in connection with the offer, sale, or purchase of any investment or security, the defendants acts or practices constituted a scheme to defraud in violation of Florida Statute § 517.301(1).

At first blush, it appears that Becker is attempting to hold the defendants to the terms and duties contained in the three agreements; therefore, she should not be

---

[11] Count One does not seek relief against Defendant Falcon FP.

[12] In Count One, Becker realleges the factual allegations in paragraphs 1–53, 69–88, 90–92, and 110–113.

able to avoid the arbitration clauses contained in those agreements, and Count One should be sent to arbitration. However, Becker opened her individual account with DKE prior to the creation of the Trust. The documents that Becker claimed she signed to open the account with DKE are not part of the record. Therefore, the defendants, to the extent that they were involved in the purchase and sale of securities through Becker's individual DKE account, owed to Becker a duty not to employ a scheme to defraud her based on their investment advice independent of the three agreements that the Trust later entered into with IFG-SEC. Accordingly, to the extent that Count One relies on disputes concerning security investments not connected to the Trust, these disputes are not within the scope of the arbitration agreements entered into by the defendants and the Trust, and these aspects of Count One are not arbitrable. *See Bratt Enters., Inc. v. Noble Int'l Ltd.,* 338 F.3d 609, 613 (6th Cir. 2003) (holding that only the aspects of plaintiff's breach of contract claim that the parties had agreed to arbitrate were subject to arbitration).

The defendants also argue that Becker's allegation that the very creation of the Trust was an unsuitable investment for her financial objectives, and her allegation as trustee that certain investments for the Trust were unsuitable for the Trust are impossible to separate. We disagree. The Trust was created prior to the time that the Trust opened the accounts with IFG-SEC and entered into the

20

agreements containing the arbitration clauses. Becker alleges that documents used to create the Trust contained unusual provisions to restrict her ability to ever replace Defendant Davis as trustee, and this allowed the defendants to control a large part of her assets and was therefore unsuitable for her personal investment objectives.[13] This allegation is separate and distinct from an allegation that the investments that the defendants entered into on behalf of the Trust were unsuitable for the Trust.[14]

The defendants point to the fact that we have stated that "if allegations underlying claims 'touch matters' covered by parties' arbitration agreement, then claims must be arbitrated, whatever legal labels attached to them." *Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d 1434, 1448 n.21 (11th Cir. 1998) (citing *Genesco v. T. Kakiuchi & Co.*, 815 F.2d 840, 846 (2d Cir. 1987)). However, we have also stated that even "broad arbitration clauses cannot be extended to compel parties to arbitrate disputes they have not agreed to arbitrate." *Klay*, 389 F.3d at 1195. In this case, we are presented with a complaint asserting

---

[13] The documents that created the Trust are not part of the record.

[14] The defendants also argue that since the complaint alleges that all of Davis's acts were done in the course and scope of his employment with IFG-SEC and IFG-AS, Becker's individual claims arise out of or relate to the purchase or sales of securities, which is the "business" referred to in the agreements. However, whether or not Davis was acting within the scope of his employment with IFG-SEC and IFG-AS when committing certain acts is a separate question from what type of disputes the parties agreed to arbitrate.

21

claims that contain both arbitrable and non-arbitrable disputes. While it might be more efficient to send to arbitration all the disputes contained in all the claims, the parties did not agree to such efficiency. "Congress's preeminent concern in enacting the FAA — the enforcement of private agreements to arbitrate as entered into by parties — requires that the parties only be compelled to arbitrate matters within the scope of their agreement, and this is so even when the result may be piecemeal litigation." *Bratt,* 338 F.3d at 613. If the defendants, who were providing advice to both Becker and to the Trust, wanted to arbitrate all disputes that arose from advice that the defendants gave to Becker concerning her assets *outside* of the Trust, then the defendants should have contracted with Becker to do so.

Accordingly, we find that the district court erred in categorically refusing to send Becker's individual claims to arbitration because she was not a signatory to the agreements. The three agreements were entered into by the Trust and the defendants and relate to investment advice and services concerning the purchase and sale of securities for the Trust. To the extent that Becker's individual claims concern disputes that rely upon the terms of the three agreements and attempt to hold the defendants to those terms, she cannot avoid the arbitration clauses contained in those agreements. Becker is therefore required to arbitrate any aspect

22

of her individual claims against the defendants that involve disputes concerning or relating to the investment of securities on behalf of the Trust, for the parties agreed to arbitrate these types of disputes. All other aspects of her individual claims involving disputes that do not concern or relate to the investment of securities on behalf of the Trust are not within the scope of the agreements, and are therefore not subject to arbitration.

C. The Defendants Falcon FM and Falcon FP as Nonsignatories

The defendants argue that the district court erred when it concluded that because the defendants Falcon FM and Falcon FP were not signatories to the agreements, they could not compel arbitration of the claims against them. The defendants argue that since the complaint alleges a conspiracy between signatory defendants and nonsignatory defendants, equitable estoppel allows a nonsignatory defendant to compel arbitration. We agree.

The complaint alleges that "[a]ll of Defendant Davis' acts, misrepresentations, omissions, and other wrongdoing complained of herein occurred while [Davis] was acting within the scope and during the course of his employment with the defendants Falcon FM [and] Falcon FP." The complaint further alleges that:

> Working together while appearing to be independent of one another enabled [all] Defendants to induce Plaintiff to adopt a fundamental financial strategy

23

and structure . . . that was unsuitable for her personal investment objectives and financial situation; and enabled them to induce Plaintiff to authorize the implementation of certain of their recommendations and courses of action that were supposedly in her best interest, but in fact were calculated to subtly but intractably victimize Plaintiff and benefit them, instead, by allowing them to obtain a substantial amount of Plaintiff's wealth over many years.

Plaintiffs incorporated these allegations into all their claims.

We stated that the "'application of equitable estoppel is warranted . . . when the signatory [to the contract containing the arbitration clause] raises allegations of . . . substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract.'" *MS Dealer*, 177 F.3d at 947 (alterations and omissions in original). In *MS Dealer*, Franklin bought a car from Jim Burke Motors, Inc. Franklin and Jim Burke executed a "Buyers Order" that contained an arbitration agreement. The Buyers Order incorporated by reference a Retail Installment Contract in which Franklin was charged a fee for a service contract through MS Dealer. MS Dealer was not a signatory to either the Buyers Contract or the Retail Installment Contract.

After discovering defects in the car, Franklin filed suit against Jim Burke and MS Dealer for breach of contract, fraud, and conspiracy in state court. MS Dealer filed a petition in federal court to compel Franklin to arbitrate her claims against it. The district court denied the petition finding that MS Dealer was not a signatory on the contracts; therefore, it did not have standing to compel arbitration.

24

We reversed. We stated that Franklin's claims against Burke and MS Dealer "are based on the same facts and inherently inseparable." *Id*. at 948 (internal quotation marks omitted). Franklin's claim that Burke and MS Dealer conspired with each other and schemed to defraud her were "allegations of such pre-arranged, collusive behavior [that they] establish[] that [her] claims against [MS Dealer are] intimately founded in an intertwined with obligations imposed by the [Buyers Order.]" *Id*. (alterations in original) (internal quotation marks omitted). Therefore, Franklin was equitably estopped from avoiding arbitration with MS Dealer.

In the case before us, the Trust's claims allege that both signatories (Davis and IFG) and nonsignatories (Falcon FM and Falcon FP) to the agreements collaborated to make unsound financial decisions, which ultimately lost money for the Trust. Therefore, the Trust's allegations of collusive behavior against the signatories and nonsignatories "are intimately founded in and intertwined with obligations imposed" by the agreements the Trust entered into with Davis and IFG-SEC. *See id.* (internal quotation marks omitted). Accordingly, the Trust is equitably estopped from avoiding arbitration with Falcon FM and Falcon FP. Becker is also equitably estopped from avoiding arbitration with Falcon FM and Falcon FP to the extent that her individual claims involve disputes that rely upon the terms of the agreements.

25

The plaintiffs attempt to distinguish *MS Dealer* by arguing that the arbitration clause in *MS Dealer* contained broad language, whereas the arbitration clause before us is more narrowly written. In *MS Dealer*, the arbitration clause stated that: "Buyer hereby acknowledges and agrees that all disputes and controversies of every kind and nature between buyer and Jim Burke Motors, Inc. *arising out of or in connection with* the purchase of this vehicle will be resolved by arbitration." *Id*. at 944 (emphasis added). The arbitration clause in agreement one states that "[a]ny controversy between us *arising out of* our business or this agreement shall be submitted to arbitration."[15] (Emphasis added). The plaintiffs argue that the arbitration clause at issue does not contain the "in connection with" language required to constitute a broad arbitration clause.

We have held that there was no meaningful distinction between arbitration clauses that have "arising out of" language and those that have "arising out of and in connection with" language. *Gregory v. Electro-Mech. Corp.*, 83 F.3d 382, 386 (11th Cir. 1996). Since federal policy requires us to construe arbitration clauses generously, resolving all doubts in favor of arbitration, *see Gregory*, 83 F.3d at 385-86, the plaintiffs' attempt to parse the language of the arbitration clauses is not persuasive.

---

[15] The arbitration clauses in agreements two and three also employ the "arising out of" language.

D.  Count Nineteen

The defendants also argue that the district court erred in refusing to send Count Nineteen, Becker and the Trust's claim for an accounting of the Trust, to arbitration.  Count Nineteen alleges that Davis as trustee of the Trust breached his duty pursuant to Florida Statutes § 737.303 to provide annual statements of the Trust's account and all other information pertaining to the Trust's assets.  The district court stated that this request for an accounting did not arise from the "business" referred to in the three agreements.  However, an accounting is a remedy attached to a separate independent cause of action.  *See Johnson v. Pullman, Inc.*, 845 F.2d 911, 913 (11th Cir. 1988) ("Although plaintiff's complaint contained a count in which an accounting was sought, that relief would not be available here absent some independent cause of action.").

Accordingly, if the four substantive claims brought by the Trust against the defendants arise out of the agreements and are therefore subject to arbitration, as the parties agree, the Trust's claim for an accounting, which is merely a remedy for any liability, would also arise out of the agreements.  Furthermore, to the extent that Becker's individual claims rely on the terms of the agreements and are therefore subject to arbitration, Becker's individual claim for an accounting of the Trust's assets also rely on the terms of the agreements and are subject to

arbitration. Accordingly, we find that the district court erred in not sending Count Nineteen to arbitration.

## IV. CONCLUSION

We find that the district court erred in holding that all aspects of Becker's individual claims were not subject to arbitration because she was not a signatory to the three agreements that contained arbitration clauses. To the extent that Becker's claims concern disputes that rely upon the terms of the agreements and attempt to hold the defendants to these terms, she cannot avoid the arbitration clauses contained in those agreements. We affirm the district court to the extent that Becker's individual claims do not rely on the terms of the agreements. We also find that the district court erred in holding that the defendants Falcon FM and Falcon FP could not compel the Trust and Becker to arbitrate the claims against them concerning matters that arose from the three agreements. Finally, we find that the district court erred in holding that Count Nineteen, the Trust and Becker's claim for an accounting, was not subject to arbitration since a claim for an accounting is only a remedy attached to an independent cause of action.

**AFFIRMED in part; REVERSED in part and REMANDED** to the district court for further proceedings consistent with this opinion.